IMPLEMENT DEALERS MUTUAL INS.
CO., Appellant,

v.

Harry CASTLEBERRY, Appellee.

No. 6618.

Court of Civil Appeals of Texas.

Beaumont.

May 16, 1963.

Rehearing Denied June 12, 1963.

Thompson, Coe, Cousins & Irons, Dallas, for appellant.

Dies, Anderson & Dies, Lufkin, for appellee.

STEPHENSON, Justice.

This is a suit to recover upon a fire insurance policy after the premises were destroyed by fire. The frame building was insured for $10,000.00 and the contents for $2,500.00. The property insured was located in the City of Lufkin, and was described in the policy as "owner-dwelling". It was a two and a half, or three story house containing: one 2-room apartment, 5 bedrooms, a lobby and a reception room on the first floor; four 2-bedroom apartments, a bedroom and a lobby on the second floor; and, three 1-room apartments, a bedroom and a lobby on the third floor. Judgment was rendered for plaintiff for the full amount of the policy based upon a jury verdict. The parties will be designated here as they were in the trial court.

The defendant's answer contained the following:

"VI.

"Defendant alleges that the policy of insurance upon its face shows the dwelling described therein as being occupied as an owner dwelling. In truth and in fact, during the entire time that the policy was in force, the building was occupied as a boarding house, rooming house or apartment. The rate which should have been charged according to the rules and regulations promulgated by the State Board of Insurance, pursuant to statutory authority, had the correct occupancy been stated on the face of the policy, would have been substantially higher than was actually charged for an owner occupied dwelling. In this connection, Defendant alleges that its agents, servants or employees were not in fact aware of the true and actual occupancy of the building. Defendant further alleges that the statement of occupancy upon the face of the policy is a war-

ranty. That the difference in occupancy is material.

"Defendant alleges that its policy of insurance provides in part as follows:

" 'Unless otherwise provided in writing added hereto, this company shall not be liable for loss occurring * * * (a) while the hazard is increased by any means within the knowledge and control of the insured, provided such increase in hazard is not usual and incidental to the occupancy as hereon described; or * * * (e) while any other stipulation or condition of this policy is being violated.'

"Defendant says that the above provisions apply to the fact situation here presented. Therefore, there is no liability."

"VIII.

"Defendant further says that its policy of insurance provides in part as follows:

" 'This policy shall be void if, whether before or after a loss, the insured has willfully concealed or misrepresented any material factor circumstance concerning this insurance, or the subject thereof, or the interest of the insured therein, or in case of any fraud or false swearing by the insured relating thereto.'

"Defendant alleges that because of the misrepresentation applicable to the occupancy of the building, the above provision came into effect, was material and should be applied."

The evidence showed policies of insurance had been written upon these premises through the office of Woodrow Scott, insurance agent, for many years. Scott had written policies of insurance on these premises while plaintiff's mother was alive and resided there. At that time the policies described the property as "owner-dwelling". After the death of plaintiff's mother, in 1953, the policy of insurance showed plaintiff to be the administrator of his mother's estate and again described the premises as "owner-dwelling". The last policy written in the name of plaintiff, and the one here sued upon, continued to designate the property as "owner-dwelling". This was done even though Scott knew the plaintiff did not reside on these premises. The testimony shows unequivocally that plaintiff did not cause the property to be so designated, did not misrepresent the use of the premises, did not tell Scott anything untrue about such use, and did not fail to answer any questions asked by Scott. Scott admitted he did not consult with plaintiff as to what kind of policy he should have, but wrote him a policy and carried it to his house. The house to which he delivered the policy to plaintiff was not the premises insured. On cross-examination, Scott testified as follows:

"Q. Mr. Scott, when people buy insurance from you—and I don't say this with any reflection whatsoever—they rely on you as the agent to issue them the policy that they should have, do they not?

"A. Correct.

"Q. And you are supposed to be and you are the specialist as far as knowing what kind of policy ought to be issued, are you not?

"A. Yes.

"Q. If this policy was issued as an owner-dwelling, the mistake was yours and your secretary's and not Mr. Castleberry's?

"A. If there was a mistake in issuing the policy, it was either my fault or my secretary's fault, and I would say it was my fault."

The defendant proved the insured premises were being used as a rooming house at the time of the fire, and that the premi-

um rate for insurance on a "rooming house" was higher than the rate charged plaintiff.

The jury found: That Woodrow Scott knew the use being made of the premises. That plaintiff told Woodrow Scott what use was being made of the premises. That plaintiff truthfully answered any inquiries made by Woodrow Scott as to the use of the premises. That the mistake on the policy as to the use of the premises was not due to any statement made by plaintiff. That plaintiff relied upon Woodrow Scott to correctly prepare the insurance policy. That plaintiff did not know of the mistake in the policy describing the use of the premises until after the fire.

Appellant contends first that there was no evidence to support the finding of the jury that Woodrow Scott knew the use being made of the premises. This is a question of law to be tested on appeal by considering only the evidence favorable to the verdict and disregarding all other evidence. A review of the record from this standpoint reveals that Woodrow Scott was well acquainted with the owner and his actual residence, and also with the occupancy of the house at the time of the issuance of the policy and for many years before. The plaintiff testified in part, as follows:

"* * * after I explained to Mr. Scott my interest in raising the insurance on it, he told me that he didn't think it would be necessary, since there were so many people in the building going and coming at all hours of the day and night, that if a fire started, one of them would notice it, and it wouldn't be a total loss, anyway."

"Mr. Scott knew that I had the building leased to other parties."

"Q. Had Mr. Scott ever been by this building?

"A. Many times.

"Q. Had he ever been in it?

"A. Yes.

"Q. Did you and he discuss on this occasion in your home in June of 1961 the fact that it was being leased to other tenants? Was that discussed freely between the two of you?

"A. Yes."

"Q. Did you ever tell Woodrow Scott that you were living in this building on 506 North Angelina Street?

"A. I did not. Woodrow Scott knew and positively knew—it is not hearsay—he knew that I wasn't living in the building.

"Q. Well, how did he happen to come to this house on Marcus Street to discuss issuing this policy?

"A. Because he knew—and it is not hearsay—he knew that I lived there.

"Q. All right. Did he know where this building was on Marcus Street that was later insured—I mean, on North Angelina Street?

"A. He did.

"Q. Had he been in that building?

"A. He had.

"Q. Did he know that you and Betsy Rose and your children were not living in that building?

"A. He did.

"Q. Did you tell him on that occasion and on other occasions it was being rented to tenants?

"A. I did."

Woodrow Scott testified on cross examination:

"Q. Mr. Scott, at the time you issued the policy which is made the basis of this lawsuit, of course, you knew that the building in question was being rented to various tenants, did you not?

"A. I knew it was a tenant-dwelling.

"Q. Well, how did you know that?

"A. Well, I knew that Mrs. Castleberry was dead and Mr. Castleberry was dead, and I knew that Harry wasn't living there.

"Q. Did you know somebody was living there?

"A. Yes.

"Q. How many people did you think were living there?

"A. Well, I thought it probably was a duplex.

"Q. A 25-room house was a duplex?

"A. That's probably what I thought, that it was a duplex.

"Q. You had been in the house, hadn't you?

"A. Yes, I had been in the house some ten years before.

"Q. Well, you knew that it was a very large house?

"A. I knew it was a very large house.

"Q. Had 20 or 25 rooms?

"A. Well, I wouldn't say that my mind dwelt on 20 or 25, Martin, I knew it was a large house.

"Q. Let me ask you again—you knew that Harry wasn't living there?

"A. Correct."

All of this testimony supports the finding of the jury.

 Appellant next contends there was insufficient evidence to support such finding of the jury, and the answer was against the great weight and preponderance of the evidence. In determining this point, we must consider all of the evidence, both favorable to and contrary to the verdict.

After considering the whole record, we conclude that the verdict is not so against the weight and preponderance of the evidence as to be clearly wrong and manifestly unjust.

 Appellant has two points of error in reference to leading questions. The first of these is the court erred in overruling objections to repeated and frequent leading questions. The second is the court erred in overruling defendant's oral motion that plaintiff's counsel be instructed to cease and desist from asking leading questions. In reading through the record there are many objections made by counsel for defendant to questions asked by counsel for plaintiff, on the ground that the question was leading. For example, plaintiff's counsel asked the plaintiff:

"Do you know Woodrow Scott?" and counsel for defendant objected: "That is a leading question, if your Honor please."

Later, after many such objections had been made, counsel for defendant asked the court to instruct counsel for plaintiff not to continually ask leading and suggestive questions.

Counsel for defendant argues that a question is leading if it may be answered "yes" or "no". In McCormick & Ray on Evidence Second Edition, at page 451 it is written:

"Although many varying definitions are found the essential element necessary to render the question improper is that it suggest the specific answer desired."

At page 452, it is said:

"The Texas Courts have taken the sound position that the mere fact that it may be answered 'yes' or 'no' will not render the question improper unless it suggests which answer is desired."

At page 453, it is written:

"A question which assumes the truth of a fact in issue, so that the answer may admit that fact is a leading question."

These points are overruled. The questions propounded were not leading, and these points of error are too general for this court to consider.

 Defendant contends the trial court erred in entering judgment for plaintiff to recover for the loss of the household goods on the ground that there was no evidence of ownership. The record reveals ownership of this personal property was not contested during the course of the trial. Plaintiff testified at great length as to the nature and value of this personal property, but he was not asked by counsel for either party about ownership. The evidence did reflect that plaintiff had acquired the premises from his mother by inheritance. No issue was submitted to the jury as to ownership of the real estate, and no complaint was made in this regard. No exception or objection was made to the court's charge because of the failure to submit an issue as to ownership, and no issue on this subject was requested. It has been held that mere possession of property covered by an insurance policy is prima facie evidence of ownership thereof in an action on the policy. Mutual Fire & Automobile Ins. Co. v. Muckelroy, Tex.Civ.App., 236 S.W.2d 555. Possession alone raises a rebuttable presumption of ownership to real and personal property. There was no evidence to the contrary. The trial court did not err in granting judgment for plaintiff to recover for the loss of their personal property.

During the voir dire examination of the jury panel, counsel for defendant asked the general question as to whether counsel for plaintiff had ever represented any member of the jury panel. None of the jurors held up their hand or answered in the affirmative. Martin Dies, Jr., conducted the examination of the jurors for plaintiff and upon completion, retired to another room with Clark Anderson, another member of the firm of Dies, Anderson and Dies, to strike the list. The name of one juror, Mrs. Cora Freeman, was checked in the office of the District Clerk and it was found that Clark Anderson had represented her in the past. Clark Anderson conveyed this information to counsel for defendant, and made an offer before the court to disqualify Mrs. Cora Freeman. At the time of this offer, counsel for defendant had struck his list and passed it to the District Clerk. However, at such time no one had looked at the list to see which jurors had been struck, and counsel for plaintiff had not turned in his list. Counsel for defendant did not accept this offer, indicating he did not want to have to examine another juror, and made a motion for a mistrial. This motion was denied.

 The examination of a juror on his voir dire has a two-fold purpose. First, to determine whether a challenge for cause exists, and then to ascertain whether it is wise and expedient to exercise a peremptory challenge. It is important to determine whether or not the attorney-client relationship has existed between the attorneys and the jurors. It is the duty of a juror to make full and truthful answers to the questions asked, and to neither falsely state a fact, nor conceal any material information. In this instance counsel for defendant was entitled to know the juror, Mrs. Cora Freeman, had been represented by Clark Anderson. However, in this case the information came from the attorney, rather than the juror, as it does in many instances, and counsel for defendant knew of the relationship before the selection of the jury had been completed, and the jury for this case sworn.

 It has been held that a peremptory challenge may be exercised up until the time jury is sworn. Herrin Transportation Co. v. Peterson, 216 S.W.2d 245.

There was no indication that the other eleven jurors were not acceptable to defendant. Mrs. Cora Freeman could have been excused by the court and another juror interrogated by the attorneys. The trial court was not obligated under these circumstances to grant a mistrial and begin anew the selection of the jury from a different panel. We hold the failure of counsel to agree to disqualify the juror before the jury had been sworn was a waiver of this right to complain of the court's action in denying the motion for a mistrial.

We find no merit to the other points of error.

Affirmed.